**MICHELLE HOLMAN KERIN,** OSB No. 965278
michelle@angelicalfo.com
**JOANNA PERINI-ABBOTT,** OSB No. 141394
joanna@angelicalfo.com
**RYAN SHELLEY** (*Pro Hac Vice*)
ryan@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ORIANA REBECCA KOROL,<br><br>Defendant. | Case No. 3:25-cr-00469-YY<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

## I. INTRODUCTION

On October 12, 2025, Oriana Korol went to the ICE facility on South Macadam Avenue to play the clarinet for the Unpresidented Brass Band, a marching band that supports protests and demonstrations by performing music with the intention of de-escalating tension and creating levity. Ms. Korol did not go to the protest looking for a confrontation with federal agents. What happened that day was chaotic, frightening, and fast. In just seconds, Ms. Korol's life changed.

Ms. Korol does not ask this Court to excuse what she did in those seconds. She accepts full responsibility for her conduct and is deeply sorry that her actions contributed to a volatile

scene. Violence of any kind is contrary to everything she believes and everything she has built her life around. She has set out her remorse in her own letter to the Court, in which she apologizes to Officer Perez and to the other officers involved, and she intends to express it again directly to the Court at sentencing. (Exhibit D to the Confidential Supplement to the Presentence Report.)

But Ms. Korol is far more than the events of that evening. She is a devoted mother to a young daughter, a loving partner to her fiancé, and a caregiver to two aging parents who moved across the country so that she could look after them. She is a licensed clinical social worker who has spent her entire professional life helping others: as a wilderness therapy guide, as a psychiatric technician, as a nonprofit therapist, and now as the founder of her own practice. At 39, she has no criminal history of any kind. PSR ¶¶ 31–33. Her true character can be found in the many letters of support submitted to this Court by members of her community. (Exhibit E to the Confidential Supplement to the Presentence Report.)

Neither a term of additional imprisonment or supervision, nor a financial penalty is required to meet the goals of sentencing. As described in more detail below, Ms. Korol has already been punished for her conduct:

- She was pepper sprayed twice in the face within seconds and exposed to tear gas and other chemical munitions.
- Because she suffers from severe asthma, PSR ¶¶ 46–47, she believed she was having an asthma attack.
- She was then subjected to cruel and abusive conduct at the hands of the government's agents, which included an agent intentionally pulling a face mask soaked in chemical munitions over her mouth and eyes as she begged for help—all while she was fully compliant with her hands cuffed behind her back and multiple agents at her side. *See* Exhibit B.

- Following her arrest, officers screamed expletives in her face while she was in obvious physical and medical distress and offered little assistance—again while she was fully complaint with her hands cuffed behind her back. *See* Exhibit C.

- She suffered headaches and other effects from the exposure to chemicals for days afterward and required continued medical attention. See, Exhibit D.

- She spent three nights in the Clark County Jail in Vancouver, Washington, outside this District and across the state line, without adequate medical care and separated from her then three-year-old daughter, while she waited for the government to decide what to charge her with.

- Her professional licenses to do the job she loves are under review by State authorities because of her conviction. See, Exhibit D.

None of this punishment was imposed by a court, and almost none of it appears in the presentence report. But it is significant all the same.

The defense agrees the guideline range in the PSR is properly calculated, but it vastly overstates the offense here.[1] Given the offense conduct as agreed to by the parties, the punishment Ms. Korol has already endured, the goals of sentencing, and the directive that this Court impose punishment that is sufficient but not greater than necessary, Ms. Korol joins the government and the probation office in recommending a sentence of time served. However, the defense respectfully disagrees that any term of supervised release or fine is necessary. A sentence of time served, with no supervision and no fine, would reflect the circumstances of this offense and this prosecution, Ms. Korol's personal characteristics and life experience, and the need to avoid unwarranted sentencing disparities. It is sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

/ / /

[1] Notably, the sentencing guidelines for both a misdemeanor and a felony conviction under 18 USC §111 are the same.

## II. OFFENSE CONDUCT AND THE PSR

The Offense Conduct is not accurately described by the PSR.[2] On October 12, 2025, Ms. Korol and the Unpresidented Brass Band played music at a protest at the ICE facility on South Macadam Avenue. At around five o'clock, after playing for more than an hour, Ms. Korol and the band began their final number: the theme song from *Ghostbusters.* There had been a jovial and celebratory vibe in the crowd when they began earlier that day: many members of the band were dressed in banana costumes, and they had just celebrated the riders of Portland's Emergency Naked Bike Ride that passed through the protest. As the day was winding down, no member of the band, including Ms. Korol, had had any contact with law enforcement. But as the *Ghostbusters*' theme began, the mood at the facility took a turn when agents began to move protestors further from the detention facility. Armed agents in full tactical gear chased a man and then suddenly tackled him into Ms. Korol's bandmate. The tackle knocked Ms. Korol's bandmate down hard enough that he later required medical treatment for injuries sustained in the crash.[3] The force and injury, along with concern for the man being arrested, created fear and confusion among the crowd. The area where the band was playing was fenced and muddy—both

---

[2] The objection to and refutation of the PSR's description of the offense conduct in this memorandum is not intended to minimize Ms. Korol's actions that underlie her conviction or to shirk responsibility. Ms. Korol takes full responsibility for her conduct. But a jury already determined the government failed to meet its burden for the offense conduct as described in the PSR. Indeed, this is why the offense conduct in the plea agreement is circumscribed from the government's original theory and more accurately portrays what happened. The additional allegations offered in the PSR are contested and should not be part of the Court's consideration in determining an appropriate sentence for Ms. Korol.

[3] Trial Transcript, Day 2, p.166, Lines 4-10 (Boudouris)(testifying that he received four stitches to his lip as a result of the collision).

law enforcement and onlookers testified at trial that it was slippery and easy to lose balance;[4] the videos introduced at trial, and attached to this memorandum, show this as well.

Agents then had the man they tackled on the ground in front of Ms. Korol. Ex. A at 0:00:00-02. Agent Marcum sat on top of him, pinning him down while another agent punched him in the head. *Id.* at 0:00:02-03.[5] Ms. Korol testified at trial that, as a trained wilderness first responder, she wanted to make sure she was present if the man being arrested needed first aid given the force the officers were using on him.[6] As Ms. Korol struggled to keep her balance amid the skirmish, Officer Perez shoved her from behind and she fell forward on top of the man. Ex. A

---

[4] Trial Transcript, Day one: Page 57, lines 8-9 (Ofc. Duncan); Page 93, Lines 8-14 (Ofc. Perez); Trial Transcript, Day 2: pp. 147-148, Lines 25-2 (Thompson); Page 170, Lines 7-18 (Downey).

[5] The PSR erroneously reports that Ms. Korol "attempted to release" the man "from the agents' grasps." PSR ¶ 14. This assertion is not part of the factual basis agreed to by the parties and is disproven by video of the incident, which shows an agent use a fist clutching a cell phone to punch the man in head while Agent Marcum has him pinned to the ground. The strike causes those standing nearby, including Ms. Korol, to lose their balance and Ms. Korol tries to use her arms for support before Agent Perez shoves her on top of the man from behind. Ex. A at 0:00:00-08. At no point does Ms. Korol "attempt[] to release" anyone.

The PSR similarly misreports that Ms. Korol later bit Officer Perez. PSR ¶ 15. The alleged bite is also not part of the agreed factual basis, because it never happened. This allegation was contested at Ms. Korol's trial where the government failed to secure a conviction, and it forms no part of the offense of conviction. As with the "attempted [] release," this allegation is directly undermined by video evidence, which shows that Ms. Korol's mouth was covered by a face mask throughout the period in which the bite is alleged to have occurred. Ex. A at 0:00:18-43. Additionally, her hand was in between her mouth and Officer Perez's arm during the exact time of the bite. Officer Perez initially reported that Ms. Korol bit his right arm. PSR ¶ 15. But once another agent reviewed the video footage and determined that was impossible, the government's story changed and they alleged Ms. Korol actually bit Officer Perez's left arm. *Id.* She bit neither.

[6] Trial transcript, Day 2: pp. 208-209, Lines 22-3, p. 209, Lines 4-14, pp.223-224, lines 21-19 (Korol). Other witnesses reported similar concerns given the manner in which agents were restraining the man. Trial testimony, Day 2: p. 188, Lines 1-2 (Huson); pp. 164-165, lines 1-13 (Bourdois).

at 0:00:03-06. When she tried to get back to her feet, Officer Perez grabbed her, put his finger in her face, and screamed at her from behind the gas mask he and the other agents wore to protect themselves from the chemical munitions they indiscriminately sprayed into the crowd from a nearby rooftop.[7] *Id.* at 0:00:06-13. Agent Marcum then sprayed pepper spray directly into Ms. Korol's face. *Id.* at 0:00:11-13. When she flinched in pain, Officer Perez testified he shoved her to the ground a second time.[8] *Id.* at 0:00:13-16. And as she fell backwards onto the wet ground, Agent Marcum pepper sprayed her in the face again. *Id.* at 0:00:14-16. The few seconds that follow are what give rise to Ms. Korol's conviction. The agreed upon factual basis in the parties' plea agreement describes the offense conduct more accurately than the PSR—she raised her foot while on her back on the ground, it struck Officer Perez and put him in apprehension of immediate bodily harm. Plea Agreement ¶5.

/ / /

/ / /

---

[7] *See,* photo of agents holding chemical munition launchers on the rooftop of the ICE detention facility from that day at: Alex Baumhardt, *Feds Sent Guard to Portland ICE Facility Oct. 4 Despite Judge's Order*, Or. Cap. Chron. (Oct. 29, 2025), https://oregoncapitalchronicle.com/2025/10/29/feds-sent-guard-to-portland-ice-facility-oct-4-despite-judges-order/. (reviewed on August 26, 2027).

Law enforcement's indiscriminate use of pepper spray and other munitions during this time is well-reported and was the subject of a lawsuit in this courthouse. Indeed, United States District Court Judge Amy Baggio entered an injunction, later reversed by the Ninth Circuit, barring such indiscriminate use because it caused physical harm to neighbors of the ICE detention facility. Shaanth Nanguneri, *Judge Questions Feds' Use of Force with Tear Gas near Portland ICE Facility*, Or. Cap. Chron. (Feb. 13, 2026), https://oregoncapitalchronicle.com/2026/02/13/judge-questions-feds-use-of-force-with-tear-gas-near-portland-ice-facility/. (last viewed August 27, 2026).

[8] Trial Transcript, p. 97, lines 20-22 (referring to the video and testifying, "So here I'm telling Ms. Korol not to interfere, as she would be arrested. **This is when I pushed her, pushed her away,** gave her a second to get up."); see also, p. 113, lines 4-6.

## III. THIS COURT SHOULD SENTENCE MS. KOROL TO TIME SERVED

### A. Ms. Korol's Personal History and Characteristics Warrant a Time-Served Sentence.

#### 1. Ms. Korol is a Devoted Mother and Partner Whose Family Depends on Her.

Ms. Korol has been in a relationship with her fiancé, Dani Cairns, since 2019. PSR ¶ 41. They live together in Southeast Portland with their now four-year-old daughter, in a stable and loving home. *Id.* ¶¶ 41, 45. Ms. Korol restructured her professional life around her daughter: she left a salaried position at Alliance Counseling specifically because the practice would not permit her to work part-time after she was born, and Ms. Korol founded her own practice so that she could. *Id.* ¶¶ 62–63.

She is also the primary caregiver for her parents. In 2025, her parents, both 72, moved to Portland so that Ms. Korol could provide them with caregiving support. *Id.* ¶ 44. Her father recently underwent a hip replacement and needs a second one; her mother has difficulty driving. *Id.* What Ms. Korol wants most is to remain out of custody so that she can continue to care for her daughter and her parents. *Id.* Thus, any custodial sentence would fall hardest not on Ms. Korol but on a four-year-old and two seventy-two-year-olds who moved across the country to be near her.

#### 2. Ms. Korol is a Licensed Clinical Social Worker Trained in De-escalation.

Ms. Korol earned a Bachelor of Arts from Wesleyan University in 2009 and a Master of Social Work from Portland State University in 2019, and she has been a licensed social worker since July 1, 2022. PSR ¶ 56. She is also a certified Wilderness First Responder, trained to keep people medically safe in the field, and she completed training through the Oregon Intervention System in non-violent de-escalation techniques precisely because she worked with vulnerable

populations. *Id.* ¶ 57. De-escalation is not an abstraction to Ms. Korol. It is a professional skill she has practiced for more than a decade, and, as the letters described below show, a disposition the people who know her have observed for far longer.

**3. Ms. Korol Has No Criminal History.**

Ms. Korol has no juvenile adjudications, no adult convictions, no other criminal conduct, no pending charges, and no other arrests. PSR ¶¶ 31–36. Her criminal history score is zero. *Id.* ¶ 33. At 39 years old, this is her only contact with the criminal justice system.

Her conduct since her arrest confirms what that record suggests. Ms. Korol was released to pretrial supervision on October 15, 2025, and in the more than ten months since, she has not incurred a single violation. *Id.* ¶¶ 12, 87. She has complied throughout with the condition barring her from the area around the ICE facility. *Id.* ¶ 12. Whatever the Court concludes about deterrence and protection of the public under § 3553(a)(2)(B) and (C), the answer here is already in the record: Ms. Korol has spent ten months proving that she presents no risk of anything.

**B. Thirty-Five People Who Know Ms. Korol, Across Three Decades and Six States, Have Written to This Court To Support the Parties' Recommendation.**

Attached to the Confidential Supplement to the PSR are thirty-five letters written on Ms. Korol's behalf. (Ex. E to the Conf. Supp. PSR.) They come from her fiancé and co-parent; from her mother and her father; from a second cousin who has known her since she was born; from friends who have known her since the sixth grade, since college, and since her first job out of school; from the clinician who trained her and the clinician she now employs; from former colleagues in wilderness therapy, in community mental health, and in the Portland Public Schools; from the parents of the children in her daughter's daycare; and from neighbors in Portland and in the Vermont town where she grew up. They are written from Oregon, Washington, California, Illinois, New York, and Vermont.

Three things should stand out to the Court about these letters that are different from most criminal sentencings: (1) the depth of people over Ms. Korol's life who write to support her; (2) the standing and diversity of the people who write to support her; and (3) the letters' remarkable consistency in describing Ms. Korol's extraordinary kindness, her positive influence on others throughout her life, her thoughtfulness and respect for people in crisis, and her deep reflection on what she has learned as a result of her conviction. In short, the letters submitted more than support the parties' recommendation of a time served sentence, and no further punishment.

### 1. The Letters Show Ms. Korol Has Spent Her Entire Adult Life Caring for People in Crisis.

The letters trace a career devoted to helping others in service work. Beginning in 2015, Ms. Korol spent roughly two years as a field instructor at Evoke Wilderness Therapy, backpacking for a week at a time with adolescents in acute crisis: work requiring her to give up a stable home and social life to keep children safe. (Ex. E, pp. 39 and 24, LN Ltr., ZG Ltr.) She then worked as a child and family therapist in inpatient and outpatient settings before opening her own practice and building it around Medicaid clients. (Ex. E, p. 39, LN Ltr.) When CareOregon changed its credentialing requirements and many practices lost their contracts, she worked, in the words of the clinician she employs, tirelessly to complete the application and advocate for her clients, preserving coverage for roughly eighty percent of the caseload. (Ex. E, p. 26, SH Ltr.) During the 2024–25 school year she also served as a temporary school social worker at Harrison Park Middle School. (Ex. E, p. 55, HW Ltr.)

The most detailed clinical account is SA's. She describes a family case that had burned out the clinicians assigned to it, with no improvement in the family's functioning. Ms. Korol volunteered to take it. She supported the parent even where she disagreed sharply with how that parent treated her child, gave the child a different way to advocate for her own needs, and went

past the required step of making referrals — working with the parent until each support was actually in place. SA attributes the eventual shift in that family to Ms. Korol's combination of compassion for everyone involved and her willingness to hold a firm boundary with an adult who was shaming a child and calls her ability to find the good in every party to a conflict rare. (Ex. E, SA Ltr.)

### 2. The Trait These Writers Describe Most Often Is the Capacity to Reflect While Others Escalate.

The theme recurs from people with seeming no connection to one another. AJ-A, whom Ms. Korol trained, writes that she moves with thoughtfulness and intention in a way that minimizes any potential for harm. (Ex. E, p.1, AJ-A Ltr.) CR, in twenty years, has never seen her lose her cool. (Ex. E, p. 42, CR Ltr.) KK, an auditor by training, has in eight years never heard her raise her voice or seen her show anger. (Ex. E, p. 32, KK Ltr.) A different KK, in twenty-one years, has not seen a shred of violence from her. (Ex. E, p. 34, KK Ltr.) Her mother notes she was trained in wilderness therapy to de-escalate volatile situations. (Ex. E, RK Ltr.) AR, whose Special Operations service gave him occasion to judge how people behave under pressure, writes that she is not defined by anger or violence. (Ex E, p. 44, ER Ltr.)

One letter shows the same disposition thirty years ago, when nothing was at stake for the writer. TG recalls a gathering of high school friends at which the group began mocking an absent classmate, a student on the social periphery, respected for his academic ability but ridiculed for his awkwardness. The laughter encouraged each new joke, until one boy compared the absent student's driving and manner of speaking to a malfunctioning computer. Ms. Korol did not join in. She spoke up and told the group that it was not right to select someone to ridicule when he was not there to defend himself, and that it was neither funny nor admirable. TG writes that she was passionate and level-headed at once and provoked no defensiveness: the room immediately

recognized she was right, one boy conceded the point against himself, and the evening continued without rancor. What impressed TG was that Ms. Korol could step outside the momentum of what felt to everyone else like harmless banter and see that someone was being harmed. (Ex. E, p.22, TG Ltr.) Ms. Korol's actions to do what was right and kind that day made an impression on TG that has stuck over decades.

That same kindness and commitment to doing the right thing continues in Ms. Korol's adult life. Mr. Cairns describes an incident where Ms. Korol rendered first aid to a bleeding teenager at the Naito Parkway ice rink and sitting with the girl for an hour until her parents arrived, and, on another occasion, responding to a heckling incident at a house open mic by convening a facilitated conversation rather than answering it in kind. (Ex. E, Cairns Ltr.) CU, who this year mediated a difficult conversation between Ms. Korol and another friend while this case was pending, found her steady and committed to understanding and growing from the exchange. (Exhibit E, p. 54, CU Ltr.) The point is not that Ms. Korol avoids confrontation. In every account before the Court, spanning three decades, she confronts by deescalating and trying to find common ground.

### 3. She Builds Community Wherever She Lives, and Her Generosity Costs Her Something.

The letters also show that Ms. Korol has a unique ability to bring people together and create community for the people in her world. Ms. Korol organized a free winter singing evening with childcare so that parents could participate, a family outdoor meet-up group, and her neighborhood's disaster preparedness; she also volunteers with Cascadia Wild and Bark. (Ex. E, p. 50, MS Ltr.; p. 35, KM Ltr.) SE supplies the fullest example: wanting a Montessori education for her daughter, she proposed not finding a school for her own child but organizing to expand the daycare all the children attended, so that her daughter's classmates would have it too. He

writes that he was astonished a parent of a small child had the energy for a project of that size. (Ex. E, p. 16, SE Ltr.) The pattern predates Portland. In middle school she and JR built a haunted house and charged admission in canned goods for the local food shelf, and in high school she gave clarinet lessons free of charge to other students in her music program. (Ex. E, SR Ltr.)

KM writes that Ms. Korol has offered emergency housing to many people, lends out her extra vehicle, and helps support under-resourced friends financially. (Ex. E, p. 35, KM Ltr.) MS, a single parent who lived down the street in Vermont, writes that the Korols became the family she relied on, and that Ms. Korol talked her daughter through a high school capstone project, drove her to the school, and stayed at her side until she succeeded. (Ex. E, p. 52, MS Ltr.) KK supplies the starkest illustration: when his then-girlfriend, now his wife, received distressing family news alone on campus in Connecticut with no car, Ms. Korol drove her friend the four hours to Pennsylvania in her own car and the four hours back, arriving deep into the night to provide comfort her friend. (Ex. E, KK Ltr.) Her mother captures the reflex at its smallest scale — a man crying on a Portland bus, told it looked like he was having a hard day and handed a brownie. Her mother, not surprisingly, sums it up best: “Ori doesn’t look away. People resonate for her; we are all human,” she writes. (Ex E, RK Ltr.)

#### 4. The Letters Describe the Offense Conduct as an Aberration, and Ms. Korol has Responded with Reflection Rather Than Excuses.

The letters consistently show that the conduct in the count of conviction is inconsistent with everything else in her life, and that she has responded to it by reflecting rather than explaining it away. MS calls the episode a complete outlier in twenty-one years. (Ex. E, p. 50, MS Ltr.) JR calls it greatly out of character in twenty-seven. (Ex. E, p. 46, JR Ltr.) LG, who has known her since birth, writes that she can readily picture Ms. Korol demonstrating peacefully, as

any citizen may, but that she would never jeopardize her family or principles by going beyond that. (Ex. E, p. 18, LG Ltr.)

SR, who has known Ms. Korol for 27 years, has spent eight years as a victim advocate at the St. Johnsbury Community Restorative Justice Center, which offers a non-punitive alternative to court proceedings for people who have committed misdemeanors and some felonies; she prepares victims to meet with a trained community panel and the responsible party, who together create a legally binding agreement detailing both the reparations owed to the victim and community and the steps that will prevent re-offense. Her working life is spent on precisely the question before this Court. She writes that Ms. Korol will treat this experience as another opportunity to learn: not only avoiding re-offense but deepening her growth as a person, community member, professional, and parent. (Ex. E, pp. 47-48, SR Ltr.)

These writers do not describe someone explaining the conduct away or shirking responsibility. LM writes that Ms. Korol has reflected deeply on the unintended consequences her actions can have and would take far more care to avoid any circumstance placing her in conflict with law enforcement. (Ex. E, p. 39, LN Ltr.) JR writes that she has taken accountability. (Ex. E, JR Ltr.) SC writes that she has met this proceeding with integrity and a respectful commitment to the judicial process. (Ex. E, p. 9, SC Ltr.) Her father does not claim she came away from October 12 with nothing to learn: he writes that while his faith in her character is unwavering, her good sense "is coming along." (Ex. E, p. 28, OJ Ltr.) That is not the letter of a family in denial.

### 5. The Letters Support the Parties' Joint Recommendation of Time Served, and No Further Punishment.

A sentencing court is to consider the fullest information possible concerning the defendant's life and characteristics, and to fit the punishment to the offender and not merely to

the crime. 18 U.S.C. § 3553(a)(1); *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). These thirty-five letters provide that information, covering nearly three decades, from a sixth-grade band room in Vermont to a Medicaid therapy practice in Portland, without a single other incident of this kind.

As to specific deterrence and public protection, § 3553(a)(2)(B)–(C): Ms. Korol has already served three nights in custody, endured a year of federal prosecution, suspended her practice, and KB notes that she has followed every term of her release in the nine-plus months since her arrest. (Ex. E, p. 6, KB Ltr.) The Court thus has not a prediction about her performance under supervision but a nine-month record of it. KB, who worked alongside her for years, writes that with no prior record and everything she has built in Portland at stake, she has zero reasons to jeopardize her life here and would plainly succeed on a further term of supervision. (*Id.*) SR, whose profession is assessing re-offense, states her confidence that there will be none. (Ex. E, SR Ltr.)

As to rehabilitation, § 3553(a)(2)(D): incarceration would provide nothing Ms. Korol is not already receiving from the network these letters describe: a partner, parents who sold their Vermont home of thirty years to move to her street, colleagues, and friends across six states who will hold her accountable. (Ex. E, pp. 28 and 50-51, RK Ltr. MS Ltr.)

In sum, the people who know her best, across all parts of her life, support the sentence requested by the parties and the goals of sentencing: time served and no further punishment.

### C. The Nature And Circumstances of The Offense And of This Prosecution Support a Time-Served Sentence.

#### 1. Ms. Korol Has Already Been Punished.

The offense conduct underlying the count of conviction occupies a matter of seconds and produced no injury to Officer Perez. PSR ¶ 16. What the PSR does not describe is what the

government's agents did to Ms. Korol before, during, and after that sequence. As described in detail below, Ms. Korol has already been punished for her conduct and no further punishment, whether custodial, supervisory, or financial, is necessary.

a. *An agent deliberately covered Ms. Korol's face with her chemically saturated mask while she begged for help.*

As the parties agree and the videos depict, Agent Marcum pepper sprayed Ms. Korol twice directly in the face before the assault. She, and others, were also exposed to tear gas and other chemical munitions that were being fired by agents from the rooftop of the ICE building.[9] Because of the amount of exposure she sustained and because she suffers from severe asthma, PSR ¶¶ 46–47, Ms. Korol believed she was having an asthma attack.[10] Her mouth was covered by a face mask soaked in chemical munitions while being led to a detention area with her hands cuffed behind her back.[11] What happened next is captured on the video and audio recordings in

---

[9] *The Daily Show*'s Jordan Klepper was a percipient witness to the event underlying this case. His crew documented it, and he went on to describe his observations in both his own show and subsequent interviews. For example, in an interview with Variety magazine he stated: "As we were doing talking to people, we watched ICE agents consistently shooting these pepper bullets into the crowd. We watched them shove a musical band dressed in banana suits, knock a clarinetist to the ground, shove her face into the ground." He also noted that his cameraman was deeply disturbed by the filming of the arrest but "we all had to leave because we were choking on pepper spray." Michael Schneider, *Jordan Klepper Got Pepper Sprayed at a Naked Protest for New "Daily Show" Special: "This Is What America Feels Like Right Now — Absurdity, Cruelty and Violence,"* Variety (Dec. 8, 2025), https://variety.com/2025/tv/news/jordan-klepper-pepper-sprayed-naked-protest-daily-show-1236603662/. (last visited August 27, 2026).

[10] Ms. Korol has had severe asthma for her lifetime, including being hospitalized as a child during life-threatening attacks. She did not have her inhaler on the day of the assault.

[11] Ms. Korol testified at trial, she wore a balaclava over her mouth while she played in the band to protect her identity in case any of her patients were at the protest. Many others in the crowd wore masks because of the pepper spray and chemical munitions being fired into the crowd by federal agents.

Exhibit B.[12] Desperate for help, handcuffed with agents by her side, and posing no conceivable threat, Ms. Korol begged the agents escorting her to pull down her face mask. Ex. B at 0:00:00-09 ("Can you pull my mask down, please? Please pull it down."). One agent at first appears to be assisting her by taking a hold of her mask before he deliberately pulls the entire pepper-spray-soaked mask up over Ms. Korol's face, covering both her mouth and eyes.[13] *Id.* at 0:00:09-24 ("Thank yo— no, no, no, what are you doing? Please pull it down. I'm going to have an asthma attack. I have asthma. Why are you doing this to me? Please."). Despite specifically telling the agents she was going to have an asthma attack, Ms. Korol's pleas are ignored, and the agents make her walk to the detention area with her entire face covered in the cloth soaked with chemical munitions, visibly struggling to breath. *Id.*[14]

That conduct was gratuitous and cruel. It endangered the health and safety of an asthmatic detainee after any perceived threat had been fully neutralized, while she was handcuffed and in the custody and care of federal agents.

/ / /

---

[12] Exhibit B syncs videos produced by the government in discovery so the Court is able to see the actions of the agent. The videos in the exhibit play side by side, with the most relevant visuals coming from KOROL_0000187, and the relevant audio coming from KOROL_0000020.

[13] If this matter went to trial, defense counsel was prepared to offer expert testimony at trial about the significant and well-documented deleterious effects of pepper spray on an individual's physical and mental capabilities, particularly when sprayed at such close range and directly into a person's face and eyes. Experts would have further opined that the balaclava soaked in pepper spray—both when it covered her eyes and mouth during parts of the incident and of course when agents pulled it over her entire face to leave it there as punishment, enhanced and amplified the cognitive and physical effects of the pepper spray more than a mere spray.

[14] The effect of this intense exposure to pepper spray is shown later in the video and obvious—her skin is red and irritated, her eyes are watery and closed tight, and mucus pours from her nose. *See,* Ex. C.

*b. Officer Perez screamed expletives in Ms. Korol's face while she was handcuffed and compliant.*

Exhibit C shows what happened after Ms. Korol arrived in the detention area. Still handcuffed but with her face finally uncovered, she sits as directed, is fully compliant, and desperate to appease officers so she can be relieved of her discomfort. Ex. C at 0:00:00-03. She says, "Just tell me what to do and I'll follow directions." *Id.* at 0:00:03-05. In response, Officer Perez and another agent shove her shoulder, and Perez tells her to "shut up" before he begins screaming at her. *Id.* at 0:00:05-10. He points his finger in her face, rips off his helmet and gas mask, and shouts "you fucking bit me in the arm! You're fucking sorry?" *Id.* at 0:00:10-15.[15] Visibly confused and frightened, Ms. Korol responds, "What did I do? I didn't bite you." *Id.* at 0:00:15-19. Officer Perez, still out of control, again screams and swears at Ms. Korol. *Id.* at 0:00:19-21.

*c. The hours that followed compounded the harm.*

Ms. Korol could barely see: the pepper spray had left her face burning and her glasses were broken, and she was given only a brief chance to rinse her face. Officers cut her backpack and rain gear off her body. Every officer present but one was a man. Ms. Korol is a survivor of sexual assault, PSR ¶ 39, and she told the officers so in the hope that they would respond accordingly. They did not. She was held alone in a cell for roughly six hours with no food and no phone call, while her family had no idea where she was; she grew cold enough that officers gave her a survival blanket. She was told she would be released that night if she cooperated but was instead transported across the state line to the Clark County Jail. She left with abrasions on her

---

[15] In response to witnessing the agents' aggression, another person who is detained and standing nearby says "hey, chill out." Perez continues to berate Ms. Korol while an agent next to him points in the detainee's face and tells him to "shut the fuck up." *Id.* 0:00:16-17.

forehead and hands, bruises across her body, and a headache and impaired vision that persisted for forty-eight hours after her head was driven into the ground.[16] She received no pain medication for roughly twenty-four hours. She has since developed trauma symptoms and has returned to therapy. (Korol Ltr.)

*d. Ms. Korol's four days and three nights in custody were a product of the government's charging pace, not of any judicial determination that she should be held.*

Ms. Korol was arrested at approximately 5:00 p.m. on Sunday, October 12, 2025. Plea Agreement ¶ 5. She was taken from the ICE facility to the Clark County Jail in Vancouver, Washington—outside this District and across the state line. The government did not file a complaint against her until Tuesday, October 14, at 4:39 p.m. On Tuesday afternoon, with no charge on file, her supporters gathered at the federal courthouse only to learn that no appearance had been scheduled. She was not brought before a judicial officer until Wednesday, October 15, roughly 65 hours after her arrest, and her first opportunity to be released. At that appearance she was released on conditions and she has remained on release without a single violation in the ten months since. PSR ¶¶ 12, 87.

---

[16] Headaches are a known side effect of pepper spray exposure, and if they linger after exposure, they can be a symptom of a serious medical condition. See, Thottempudi N, Kovalev D, Munder SP, Shaltoni H, Chhabra AS, Raghuram K, Patel AV. *Reversible Cerebral Vasoconstriction Syndrome Following Exposure to Oleoresin Capsicum "Pepper Spray"*. J Stroke Cerebrovasc Dis. 2021 Oct;30(10):106006. doi: 10.1016/j.jstrokecerebrovasdis.2021.106006. Epub 2021 Jul 26. PMID: 34325271, https://pubmed.ncbi.nlm.nih.gov/34325271/ (last visited August 27, 2026).

Given the manner in which Ms. Korol was exposed to pepper spray, e.g. two direct sprays to her face within seconds and then a pepper spray rag bound to her face both during the scuffle and fully by officers, it is no wonder that Ms. Korol's symptoms from her pepper spray exposure lasted more than three days after the incident.

No judicial officer has ever found that Ms. Korol should be detained as she is not a danger to the community nor a risk of flight. She spent three nights in an out-of-state jail, injured and away from her three-year-old daughter, because the government waited days before filing a charge.[17] *See* Fed. R. Crim. P. 5(a)(1)(A) (a person arrested within the United States must be taken before a magistrate judge "without unnecessary delay"); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–57 (1991) (a probable cause determination is generally prompt if made within 48 hours of arrest, and an intervening weekend does not justify delay beyond that period). This delay matters for Ms. Korol's sentencing. A "time served" sentence here consists of those four days, which were fixed not by any assessment of what this offense deserves, but by how long the government took to file a charge. That is one more reason the Court should decline to add anything further to it.

Taken together, these circumstances are punishment Ms. Korol has already sustained, outside any judgment of any court. Section 3553(a) directs the Court to impose a sentence that is sufficient but not greater than necessary. In assessing what is still necessary, the Court may properly account for what Ms. Korol has already suffered at the hands of the same government that now asks for more.

/ / /

/ / /

[17] The defense appreciates that Monday October 13, 2025 was Columbus day, a federally recognized holiday. However, the affidavit supporting the Complaint in this matter, was not presented to a magistrate until 4:39 p.m. on October 14, 2025, necessitating an additional day in a County jail for Ms. Korol. It is unclear given that there was no injury to Officer Perez, she did not have a criminal history, she was not a danger to the community and certainly not a risk of fight, why Ms. Korol was required to remain in jail during this period.

*e. The consequences of that evening have not ended, and they will not end at sentencing.*

Ms. Korol's license to practice is under review by the Board of Licensed Social Workers and may be suspended or revoked. The Oregon Health Authority must separately review this matter, and her Medicaid credentialing may be sanctioned. For the rest of her professional life, she will have to declare a misdemeanor assault conviction each time she is re-credentialed by a health insurer. She took a leave of absence from her practice in May 2026 because of the emotional weight of trial, and that leave has continued through the summer. She has sought therapy to process being pepper sprayed, tackled, arrested, and jailed. (Korol Ltr.) None of these consequences requires an order of this Court, and none of them would be made lighter by adding supervision or a fine.

**2. A Sentence of Time Served Avoids Unwarranted Sentencing Disparities.**

Section 3553(a)(6) directs the Court to consider the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct. Two sets of comparators bear on that inquiry here.

*a. The federal protest prosecutions in this District.*

Between June and November 2025, federal prosecutors charged 37 people with crimes allegedly committed outside the South Portland ICE facility. Twenty-four were accused of assaulting or attempting to assault a federal officer, and 17 faced felony charges carrying maximum sentences of between eight and twenty years. Of the 30 cases resolved as of July 2026, 28 defendants received probation, supervised release, or an outright dismissal. The dispositions somewhat that resemble this case, all resolved without custody. *See, e.g.*, *United States v. Miyamoto*, No. 3:25-cr-00451-SI (D. Or.) (felony charge for striking an officer in the chest with a wooden tambourine; misdemeanor plea, one year of probation); *United States v. Anzaldua-*

*Ervin*, No. 3:25-cr-00444-AR-1 (D. Or.) (felony charge for throwing a water bottle that struck an officer in the chest; misdemeanor plea, time served, one year of supervised release). Two other defendants charged with felonies also avoided custody: one charged after a federal officer pushed him with a riot shield and he pushed back received six months of probation; and one charged for spitting on an officer pleaded to a misdemeanor and received time served and one year of supervised release.[18] Only two defendants received any custodial sentence, and neither is comparable: Robert Hoopes received 30 months for aggravated assault of a federal employee with a dangerous weapon, for throwing a rock that struck an officer in the head and opened a gash above his eye, and Trenten Barker received 18 months for arson of a federal building. *Id.*

Ms. Korol's conduct is below the midpoint of that group, her personal history is *at least* as mitigating as anyone's in it, and her four days and three nights in an out-of-state jail while injured mean she has already served a more severe custodial sentence than others who were given a time served or probationary sentence. Under these circumstances, a sentence of time served with no fine or supervision places her squarely within the range of outcomes this district has produced. Anything more would make her an outlier.

*b. The January 6 pardon and clemency grants.*

On January 20, 2025, President Trump pardoned or commuted the sentences of approximately 1,500 defendants prosecuted in connection with the attack on the United States Capitol. By the Department of Justice's own count, roughly 608 of them had been charged with assaulting, resisting, or impeding federal officers or obstructing officers during a civil disorder,

---

[18] *Protesters Arrested Outside ICE Faced Daunting Prison Sentences—and Mostly Ended Up With Short Probations*, Willamette Week (July 1, 2026), available at https://www.wweek.com/news/courts/2026/07/01/protesters-arrested-outside-ice-faced-daunting-prison-sentencesand-mostly-ended-up-with-short-probations/.

including approximately 174 charged with using a deadly or dangerous weapon or causing serious bodily injury to an officer; at least 172 had pleaded guilty to assaulting law enforcement, 69 of them with a dangerous or deadly weapon. *See* Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025); U.S. Attorney's Office for the District of Columbia, *48 Months Since the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025) (page since removed from the Department's website; figures quoted in *What Just Happened: Trump's January 6 Pardons and Assaults on Law Enforcement Officers By The Numbers*, Just Security (Jan. 22, 2025), https://www.justsecurity.org/106689/january-6-pardons-statistics/). The defense does not suggest that this Court can or should review the exercise of the pardon power. The point is instead directed at the weight of the government's position. The Executive Branch asks this Court to treat a misdemeanor violation of 18 U.S.C. § 111 as serious enough to warrant a year of supervision (in addition to time already served) imposed on a first-time offender who caused no injury, having itself extinguished, in their entirety, the sentences of hundreds of defendants convicted of far graver violations of the same statute, including defendants who used deadly and dangerous weapons and caused actual bodily injury to officers. That difference is not explained by anything in the conduct.

**3. The JSIN Data in the PSR is Unreliable.**

The PSR reports that during fiscal years 2021 through 2025, 177 defendants had a primary guideline of USSG §2A2.4 with a final offense level of 11 and a criminal history category of I; that 143 of them (81%) received a sentence of imprisonment in whole or in part; and that the average and median terms were eight months. PSR ¶¶ 83, 85. Those figures should be given no weight.

First, JSIN cannot distinguish this case from a felony. JSIN aggregates cases using only three criteria: the primary sentencing guideline, the final offense level, and the criminal history

category. *See* U.S. Sent'g Comm'n, Judiciary Sentencing Information, available at https://www.ussc.gov/guidelines/judiciary-sentencing-information (last visited August 26, 2026). It does not sort by statute of conviction, by felony or misdemeanor, by injury, or by weapon use. That matters here because Ms. Korol's offense level would be identical had she been convicted of the felony charged in the November 2025 indictment: the base offense level under §2A2.4(a) is 10, the physical-contact enhancement under §2A2.4(b)(1)(A) adds three, and acceptance of responsibility subtracts two. PSR ¶¶ 21–29. The only guideline consequence of the misdemeanor conviction is that §5G1.1(c)(1) lowers the top of the range from 14 months to 12; the bottom does not move. *Id.* ¶ 67. The 177-defendant pool therefore necessarily includes defendants convicted of felony violations of § 111(a), carrying an eight-year maximum, and § 111(b), carrying a twenty-year maximum. A statistic that cannot tell a one-year offense from a twenty-year offense is not measuring the seriousness of this one. Second, a time-served sentence counts as imprisonment for JSIN purposes, so under the disposition every party recommends, Ms. Korol would herself be counted within the very 81% the PSR invokes against her. *Id.*

**D. No Term of Supervised Release is Necessary.**

Supervised release is discretionary for this offense. 18 U.S.C. § 3583(a). The Court must conduct an individualized assessment to determine whether any term is required at all, and must state its reasons on the record. USSG §§5D1.1, 5D1.2; PSR ¶ 70. Two features of that assessment are dispositive here.

**1. The Permissible Purposes of Supervision are Absent.**

Section 3583(c) directs the Court, in determining whether to impose a term of supervised release, to consider § 3553(a)(1), (a)(2)(B) through (D), and (a)(4) through (a)(7). Conspicuously absent is § 3553(a)(2)(A)—the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. Supervision may serve deterrent,

protective, and rehabilitative ends; it may not be imposed as retribution. Yet the justification offered in the PSR rests in substantial part on the need to reflect the seriousness of the offense and provide just punishment. That is not a permissible basis for a term of supervised release. *Esteras v. United States,* 606 U.S. 185 (2025)(holding that a district court may **not** consider § 3553(a)(2)(A) when revoking supervised release, because § 3583(e)'s list is exhaustive and Congress's omission was deliberate.)

### 2. The PSR has Identified No Rehabilitative or Protective Need.

The PSR reports no substance abuse problem; indeed, the probation office affirmatively recommends suspending the mandatory drug-testing condition because Ms. Korol poses a low risk of future substance abuse. It reports no mental health treatment need. PSR ¶¶ 48–49, 55. She has stable housing, *id.* ¶ 45, stable self-employment, *id.* ¶ 63, no criminal history, *id.* ¶ 33, and ten months of flawless pretrial compliance, *id.* ¶¶ 12, 87—including compliance with the very exclusion-zone condition the government asks the Court to impose after sentencing. She has already demonstrated the condition. There is nothing left for supervision to accomplish. The 35 letters described above say the same thing from 35 independent directions. The consequences that will follow Ms. Korol regardless of what this Court does—a licensing review, a credentialing review, and a lifetime of disclosure obligations—supply whatever specific deterrence § 3553(a)(2)(B) could require. (Korol Ltr.)

### 3. The Recommended Conditions Would Impose Burdens Well Beyond What Any Purpose Requires.

Under § 3583(d)(2), each condition must involve no greater deprivation of liberty than is reasonably necessary. At least seven of the recommended conditions fail that test as applied to Ms. Korol:

1. Standard condition 7 would require her to work at least 30 hours per week unless excused. Ms. Korol works part time by design, having restructured her professional life for exactly that purpose after her daughter was born. PSR ¶¶ 62–63. She is also the caregiver for two aging parents. *Id.* ¶ 44. The condition would require her to seek a probation officer's dispensation to continue the arrangement that allows her to care for her family.
2. Standard condition 8 would bar her from knowingly communicating or interacting with any person she knows to have a felony conviction without a probation officer's permission. Ms. Korol's entire professional life has been spent serving justice-involved and vulnerable populations. *Id.* ¶¶ 57, 59–62. Read literally, the condition would require her to obtain governmental permission before treating a client.
3. Special condition 1 would authorize the search of her "papers, or office." Ms. Korol is a licensed clinical social worker. Her office and her papers contain the privileged treatment records of patients who have done nothing wrong and who have no notice of this proceeding. Those records are protected by the psychotherapist–patient privilege, *see* Or. Rev. Stat. § 40.230, by federal health privacy law, and by Ms. Korol's own licensing obligations. A condition that deprives third parties of confidentiality in order to monitor a first-time misdemeanant with a spotless compliance record is not reasonably necessary to any purpose of supervision.
4. Special condition 3 would prohibit Ms. Korol from entering a large portion of Southwest Portland. A map showing the proposed parameters and the location of the ICE building is included below. Neither the PSR nor the government's sentencing position paper attempt to justify this expansive restriction, which would bar Ms. Korol from a wide area of the

city she lives in. This condition would clearly be a greater deprivation of liberty than is reasonably necessary. While the defense maintains that no supervision is warranted at all, if the Court decides to impose supervision to enforce a geographic restriction, it should be limited to the federal property where the ICE facility sits and not the large swaths of Southwest Portland.




5. Special condition 5, which the PSR recommends only if the Court decides to impose a fine, would require Ms. Korol to provide the probation office with access to "any requested financial information and authorize the release of any financial information." It would also allow the probation office to "share financial information with the U.S. Attorney's Office." This is a misdemeanor assault case, not a financial crime. Allowing the probation office unfettered access to Ms. Korol's financial information that it can then share at will with the U.S. Attorney's Office is unnecessarily invasive and entirely unjustified under the facts and circumstances in this case.

6. Special condition 6, which the PSR recommends only if the Court decides to impose a fine, would prohibit Ms. Korol from using a credit card or opening new lines of credit without the approval of the probation office. This paternalistic condition is unreasonable: it is both unwarranted given the circumstances of this case and clearly a greater deprivation of Ms. Korol's economic liberty than is reasonably necessary.
7. Special condition 7, which the PSR recommends only if the Court decides to impose a fine, would forbid Ms. Korol from applying for any loan or entering into any residential or business lease agreement without approval of the probation office. This requested condition is inappropriate and unreasonable for the same reasons as special conditions 5 and 6.

Finally, supervision is not costless. The probation office's own figures put the cost of supervision by a probation officer at $519 per month and $6,222 per year. PSR ¶ 77. Section 3553(a) does not require the Court to expend those resources on a defendant who needs nothing that supervision provides. If the Court is nonetheless inclined to impose a term of supervised release, the defense respectfully requests that the term be substantially shorter than one year and that standard conditions 7 and 8 and special condition 1, 3, 5, 6 and 7 should be stricken or modified.

**E. No Fine is Necessary.**

Offering no reasoning or justification, the PSR recommends a $4,000 fine. PSR ¶¶ 76, 82. Neither the plea agreement nor the government's recommendation contemplates any fine. There is no restitution, no loss, and no pecuniary gain associated with this offense. *Id.* ¶¶ 17, 78. No fine should be ordered.

First, the PSR's net worth figure substantially overstates Ms. Korol's resources. The financial statement at ¶ 64 lists Ms. Korol's residence as an asset valued at $470,600 but lists no

mortgage among her liabilities, even though the same paragraph reports a monthly mortgage payment of $2,144. The liabilities column consists entirely of five credit card balances totaling $6,216.22. The omission of the mortgage principal alone accounts for the great majority of the reported $939,638 net worth.

The remaining assets are not available to pay a fine. Approximately $199,000 is held across seven separate retirement accounts, which cannot be reached without tax consequences and early withdrawal penalties. The $250,000 attributed to her business is the valuation of the practice Ms. Korol founded and runs, which now employs seven people and serves families throughout the tri-county area (Korol Ltr.); its value is largely her own labor, and she is in the process of converting it to a cooperative and selling portions to other therapists. *Id.* ¶ 63. Ms. Korol's actual liquid assets are $2,228.09 in checking, $52.35 in savings, and $20,360.17 in a business operating account—roughly $22,600, most of it the working capital of a practice with ongoing obligations.

Second, the reported monthly cash flow is likewise overstated. The PSR reports monthly expenses of $2,948 against monthly income of $3,541.39, yielding $593.39 in monthly cash flow. *Id.* ¶ 64. But the expense schedule contains no line for food, no line for childcare or preschool for a four-year-old, no line for health insurance, and no line for self-employment taxes. Corrected for those omissions, Ms. Korol's actual disposable income approaches zero.

Even taking the PSR's figures at face value, a $4,000 fine represents nearly seven months of Ms. Korol's entire reported disposable income. Section 5E1.2(d) requires the Court to consider, among other things, the burden the fine will impose on the defendant and her dependents and the expected costs to the government of any sentence imposed. USSG §5E1.2(d)(3), (d)(7). Both point the same direction. Ms. Korol supports a four-year-old and

assists two aging parents, and she has borne the cost of retained counsel through two trial settings. She has also been on a leave of absence from her practice since May 2026, with the lost wages that entails, and has incurred the cost of therapy to process the arrest itself. (Korol Ltr.) Where a fine would unduly burden a defendant's dependents, the Court may impose a lesser fine or none. USSG §5E1.2(e).

The fine recommendation also carries hidden costs. If a fine is imposed, the probation office recommends four additional conditions, including that Ms. Korol not incur new credit charges or open new lines of credit without approval, and that she not apply for any loan or enter any residential or business lease without prior approval. PSR, Recommended Conditions ¶¶ 4–7. For a homeowner and small business owner, those conditions would reach deeply into ordinary financial life for a full year, in service of collecting $4,000 that no party has asked for.

## III. CONCLUSION

Ms. Korol stands before the Court deeply remorseful for her conduct. She has accepted responsibility for the bad choices she made over a few seconds that caused no injury and that stand in stark contrast to the whole of her thirty-nine years. To be sure, she has already lost much as a result of those choices, spending four days in an out-of-state jail before any judicial officer ever saw her, absorbed two rounds of pepper spray and a course of gratuitous mistreatment at the hands of federal agents, and completed more than ten months of pretrial supervision without a single misstep. Her professional licenses now hang in the balance as a result of her conduct. Against that, she has a four-year-old daughter, two aging parents who moved across the country to be near her, and a practice full of patients who depend on her. Thirty-five people who have known her across three decades and six states have written to this Court to say that the few seconds at issue here are unlike anything else in her life.

For the reasons set forth above, Ms. Korol respectfully requests that the Court impose a sentence of time served, with no term of supervised release and no fine. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

DATED this 27th day of August 2026.

**ANGELI & CALFO LLC**

*/s/ Michelle Holman Kerin*________
MICHELLE HOLMAN KERIN, OSB No. 965278

*/s/ Joanna Perinni-Abbott*___________
JOANNA PERINI-ABBOTT, OSB No. 141394

*/s/ Ryan Shelley*__________________
RYAN SHELLEY (Pro Hac Vice)

*Attorneys for Defendant*